UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANDREW R. COOPER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 10-12189-DJC |
| ) | |
| KENEXA TECHNOLOGY, INC., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

**CASPER, J.** July 19, 2012

### I.  Introduction

Plaintiff Andrew R. Cooper ("Cooper") brings this complaint against his former employer, Defendant Kenexa Technology, Inc. ("Kenexa"), for breach of contract for its alleged failure to pay him a bonus of $89,400 in 2008 and 2009. Kenexa has now moved for summary judgment. For the reasons discussed below, Kenexa's motion for summary judgment is GRANTED.

### II.  Burden of Proof and Standard of Review

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the undisputed facts show that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56 (a). The moving party bears the burden of showing the basis for its motion and identifying where there exists a lack of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The nonmovant "must point to 'competent evidence' and 'specific facts' to stave off summary judgment." Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's

1

of London, 637 F.3d 53, 56 (1st Cir. 2011) (citation omitted); ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002). That is, the non-movant "must come forward with evidence sufficient for a 'a fair-minded jury [to] return a verdict' in his favor." Soto-Padro v. Public Bldgs. Auth., 675 F.3d 1, 5 (1st Cir. 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)). While the Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor," Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009), it "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" Tropigas de Puerto Rico, Inc., 637 F.3d at 56 (quoting Rogan v. City of Boston, 267 F.3d 24, 27 (1st Cir. 2001)); see Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000).

### III. Factual Background

Unless otherwise indicated, the following are the undisputed facts.[1]

#### A. Kenexa Acquires BrassRing, Cooper's Former Employer

Kenexa provides software applications, other propriety content and consulting and

---

[1] References to the dockets are abbreviated as "D. __." References to specific filings in this case are abbreviated as follows: "Def. Memo" refers to Kenexa's memorandum in support of its motion for summary judgment, D. 18; "Pl. Opp." refers to Cooper's opposition to the summary judgment motion, D. 24; "Def. Reply" refers to Kenexa's reply brief, D. 29; "SOF" refers to Kenexa's statement of undisputed facts, D. 17; "Pl. Resp. to SOF" refers to Cooper's response to Kenexa's statement of undisputed facts, D. 28; "Karsan Decl." refers to the Declaration of Nooruddin S. Karsan in support of Kenexa's motion for summary judgment, D. 19; "Karsan Dep." refers to the transcript of Karsan's deposition, D. 31-2; "Kerman Decl." refers to the Declaration of David J. Kerman in support of Kenexa's motion for summary judgment, D. 20; "Kerman Suppl. Decl." refers to Kerman's Declaration in support of Kenexa's motion to strike portions of Cooper's Affidavit, D. 31; "Cooper Dep." refers to the transcript of Cooper's deposition, D. 20-1; "Cooper Aff." refers to Cooper's Affidavit in opposition to the motion for summary judgment, D. 26.

2

outsourcing services to companies to allow them to recruit and retain their employees more effectively. SOF, ¶ 1; Karsan Decl. ¶ 2. In the fall of 2006, Kenexa acquired another company, BrassRing, Inc. ("BrassRing"). SOF, ¶ 3; Karsan Decl. ¶ 3. At the time of the acquisition, Cooper was BrassRing's Chief Information Officer with a salary of $178,000 and eligibility for an annual bonus of up to 30% of his base salary. SOF, ¶ 4.

**B.     Kenexa and Cooper Discuss His Hiring and Compensation in Late 2006**

Initially, Kenexa did not intend to hire Cooper from BrassRing upon its acquisition of the company. SOF, ¶ 5; Karsan Decl. ¶ 4. However, in late fall of 2006, Cooper had discussions with Kenexa's Chairman and Chief Executive Officer, Nooruddin S. Karsan ("Karsan") about the possibility of working for Kenexa. Id. Karsan offered him a position at Kenexa, but at a salary of $160,000, $18,000 less than Cooper had been making at BrassRing. Id.

Cooper and Karsan also discussed what Cooper's bonus structure would be if he went to work for Kenexa. Kenexa claims that Karsan offered him a bonus eligibility of $36,000. SOF, ¶ 5; Karsan Dep. at 10; Karsan Decl. ¶ 4. Cooper disputes this characterization of the bonus discussion and claims that they reached agreement that, beginning in 2007, Cooper's previous annual bonus at BrassRing (30% of $178,000 or $53,400) would increase by twice the amount of the reduction in salary that he was taking ($36,000) so that his salary at Kenexa would be $160,000 plus a yearly bonus of $89,400. Pl. Resp. to SOF, ¶ 5; Cooper Aff. ¶ 6.

Cooper does not dispute that Karsan made no specific mention of calendar years 2008 and 2009 in their conversation. SOF, ¶ 8; Pl. Resp. to SOF, ¶ 8. Cooper, however, points to Karsan's affirmative response to his question "[i]f I'm taking a reduction in compensation, that's going to be going forward. Is the bonus going to be going forward?" to support his position that this bonus

3

compensation was not limited to one year. Pl. Resp. to SOF, ¶ 5; Cooper Dep. at 40-41; Cooper Aff. at ¶¶ 7-8. Shortly after his conversation with Karsan in 2006, Cooper indicated that he understood that the amount of any bonus at Kenexa was not certain when he referred to his "bonus potential" in an e-mail and confirmed the understanding of his immediate supervisor, James Restivo ("Restivo") that Cooper was "opting to drop [his] base [salary] and take more risk" for greater bonus potential. SOF ¶ 11; Cooper Dep. at 44-46 and Exh. 4; Kerman Decl. Exh. C.

The only writing that was contemporaneous with Cooper and Karsan's conversation was a note from Karsan to Cooper stating that "I wanted to conclude our conversation. Let's catch up over the phone." SOF, ¶ 6; Kerman Decl. Exh. B. After Karsan's signature on the note, there were a few numbers on the note– "175 x 30%," "175+ 51= 226," "160," "96," and the number "240" that was marked through. Id. Karsan identified only the figures "175" and "30%" as his writing. SOF, ¶ 6 (citing Karsan Dep. at 19). Cooper does not dispute the lack of contemporaneous writings, but points to his later e-mail correspondence with Karsan and Restivo as evidence of his "contracted for" bonus for 2008 and 2009. Pl. Resp. to SOF, ¶ 6. Specifically, in communications in March 2008, Cooper disputed the initial amount of his 2007 year-end bonus. Id.; Cooper Aff. ¶¶ 14-15. On March 16, 2008, Cooper sent an e-mail stating that "My bonus target was ($178K-$160K) X 2 = $36K plus $178K X 30% = $53.4 which totals $89.4K." Id. and Exh. D. Karsan responded by stating that "[h]e's right and I did mention it [sic] Don as well. I screwed up and never put it in writing." Id.

Soon after his discussions with Karsan in late fall 2006, Cooper went to work as an at-will employee for Kenexa. SOF, ¶¶ 5, 14; Karsan Decl. ¶ 4 and Exh. A.

4

## C. Kenexa's Determination of Employee Bonuses

It is undisputed that Kenexa's determination of an individual employee's bonus was based upon the company's performance and that employee's performance. As to the company's performance, Cooper has acknowledged that Kenexa's poor performance could affect his bonus. SOF, ¶ 12; Pl. Resp. to SOF, ¶ 12; Cooper Dep. at 34-35; 49-50. The size of the general bonus pool for Kenexa's employees depended upon how well the company performed on the "Z Index," an internal metric for measuring corporate performance. SOF ¶ 17. On the Z Index, there were four milestones: gold, silver, bronze or a "zero" score. SOF ¶ 18; Karsan Decl. ¶ 10. Gold referred to the highest possible level. Id. Conversely, a zero score meant that Kenexa would pay minimal or no annual bonuses to its employees for that year. Id. In 2007, Kenexa scored at the silver level. SOF, ¶ 19; Karsan Decl. ¶ 11; Pl. Resp. to SOF, ¶ 19. The company performed less well in 2008, due in large part to the global recession that began at the end of that year, scoring only at the bronze level. SOF, ¶ 20; Karsan Decl. ¶ 12; Karsan Dep. at 52. By 2009, Kenexa continued to be adversely affected by the recession and scored a zero on the Z Index for 2009. SOF, ¶ 25.

As to his personal performance, Cooper understood that Kenexa's executives and managers would "exercise discretion in determining the amount of the bonus to be awarded to the employees whom they supervise, taking into account the employee's job performance, his/her achievement of any established goals and objectives, and the employee's value to the division/business unit." SOF, ¶ 15; Karsan Decl. ¶ 8. Cooper further acknowledges that he failed to achieve certain performance objectives in 2008. SOF, ¶¶ 22-23; Cooper Dep. at 82-88. By 2009, there was admittedly growing tension between Cooper and his supervisor, Restivo, that "generally amounted to a series of professional disagreements." SOF, ¶¶ 26-27; Cooper Dep. at 101-116. Cooper essentially disagreed

with Restivo's changes in work priorities and they had different opinions about resource allocation. SOF, ¶ 28; Cooper Dep. at 107, 113, 142.

### D. Kenexa's Bonuses to Cooper in 2007, 2008 and 2009

Kenexa gave Cooper a 2007 year-end bonus of $89,400. SOF, ¶ 19. For 2008, the company gave Cooper a year-end bonus of $14,000. SOF, ¶ 24. For 2009, Kenexa gave Cooper a year-end bonus of $5,000. SOF, ¶ 29. On May 12, 2010, Kenexa terminated Cooper. Pl. Resp. to SOF, ¶ 53; Cooper Aff. ¶ 22.[2] Cooper brings this suit claiming that Kenexa should have paid him $89,400 as a bonus in both 2008 and 2009 and, accordingly, owes him $75,400 in bonus compensation for 2008 and $84,400 in bonus compensation for 2009. Pl. Resp. to SOF, ¶ 55; Cooper Aff. at ¶ 24.

## IV. Procedural History

On November 11, 2010, Cooper filed a complaint in Middlesex Superior Court against Kenexa alleging that the company breached its contract with him by failing to pay him an annual bonus of $89,400 in 2008 and 2009. D. 1-1 at 6-10. The case was removed to this Court on December 17, 2010. D. 1. Kenexa has now moved for summary judgment. D. 16. In connection with its reply to Cooper's opposition to the summary judgment motion, Kenexa has also moved to strike certain portions of Cooper's affidavit in support of his opposition. D. 30. The Court held a hearing on both motions on July 17, 2012 and took the matters under advisement.

## V. Discussion

### A. Cooper and Kenexa Did Not Have an Enforceable Contract for a Year-End Bonus

Cooper relies upon his conversation with Karsan in November 2006 and the later March

---

[2] Cooper does not challenge his termination before this Court; the only claim he brings against Kenexa is for breach of contract related to his 2008 and 2009 bonuses.

2008 e-mail from Karsan (in connection with the calculation of his 2007 bonus) to argue that he had an enforceable contract for a $89,400 for the years 2008 and 2009. To prevail on a breach of contract claim under Massachusetts law, "a plaintiff must show: 1) the existence of a valid and binding contract, 2) that the defendant breached the terms of the contract, and 3) that the plaintiff has suffered damages from the breach." Pizzeria Uno Corp. V. Pizza by Pubs, Inc., 2011 WL 4020845, at *3 (D. Mass. Sept. 9, 2011) (citing Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1122 (1st Cir. 1995)). As to the first element–i.e., whether there is a contract– "'[a]ll the essential terms of a contract must be definite and certain so that the intention of the parties may be discovered, the nature and extent of their obligations ascertained, and their rights determined.'" PSMG Int'l, Inc. v. Nodine's Smokehouse, Inc.., 2009 WL 3679288, at *2, 08-cv-10269-RGS (D. Mass. Nov. 3, 2009) (quoting Cygan v. Megathlin, 326 Mass. 732, 733-34 (1951)). At base, the parties must have reached agreement on the material terms of the contract. PSMG Int'l, Inc., 2009 WL 3679288, at *2. "A lack of definiteness in an agreement might be based on a lack of specificity regarding the time of performance, price to be paid, work to be done, or property to be transferred" and will vary based on the facts of the individual case. Armstrong v. Rohm & Haas Co., 349 F. Supp. 2d 71, 78-79 (D. Mass. 2004) and cases cited. The issue of "[w]hether an alleged contract is legally enforceable in light of indefinite terms is a question of law for the court." Id. at 78.

Neither Cooper's November 2006 conversation with Karsan nor the subsequent e-mail communications from Karsan gave rise to an enforceable contract. The terms of the agreement here were too vague to be enforceable. In his late fall 2006 conversation with Karsan, there were no specific terms that indicated that a bonus of $89,400 was a guaranteed bonus, and not a bonus potential as Cooper later acknowledged in subsequent communications. Moreover, there was no

7

terms set during Cooper and Karsan's conversation (or the subsequent e-mail communications cited by Cooper) about his performance goals, how those goals would be assessed or weighed or how performance (or non-performance) of those goals would be compared to Kenexa's overall performance in determining his bonus for 2008 and 2009. SOF, ¶ 9.[3] Most significantly, even if Karsan's later March 2008 e-mail communication could be taken as a confirmation of a bonus of $89,400 for 2007, it is undisputed that Cooper and Karsan did not discuss what the duration of any bonus structure would be and did not discuss any bonus for 2008 and 2009 specifically. Karsan's assent to Cooper's statement that this would be his compensation "going forward," upon which Cooper now heavily relies, was vague and does not evidence agreement to the material terms that he would receive a bonus of $89,400 in 2008 and 2009.

The cases cited by Kenexa, applying Massachusetts law, regarding indefinite and vague terms not giving rise to enforceable contracts are instructive here. In <u>PSMG Int'l, Inc.</u>, 2009 WL 3679288, at *1, the single writing between the parties provided that plaintiff, a food distributor, would be the exclusive supplier for the defendant, a food manufacturer, in China, Hong Kong, Malaysia and Taiwan. <u>Id.</u> This letter did not mention "the duration [of the contract], the parties' respective obligations, or the amount or nature of any commissions to be paid." <u>Id.</u> The plaintiff alleged that the defendant had also orally agreed to supply "all documentation necessary" to export

---

[3]Cooper claims that he disputes the absence of these terms in his 2006 discussion with Karsan (even as he suggests that Karsan said that his bonus could exceed the allegedly agreed-upon amount), Pl. Resp. to SOF, ¶ 9, but the portions of his deposition that he references in support of this alleged dispute actually show the absence of any genuine dispute of material fact as to this issue. Cooper Dep. at 33 (saying that Karsan "wasn't totally clear" that the bonus was "a target" and that Cooper's subjective expectation was that given Kenexa's profitability, he thought "it would be very different" from the target bonus structure at BrassRing) and 40 (noting that they did not discuss his personal performance goals, but those "would be worked out annually"); <u>see</u> Def. Reply at 6.

its product to Asia. Id. Defendant argued that such a promise was unenforceable. Id. The parties proceeded to perform under the alleged contract, but when its food products were confiscated by Chinese authorities when the plaintiff attempted to enter China, it sued the defendant for breach of contract for its failure to provide the necessary documentation to do so. Id. The court rejected the plaintiff's argument because the promise was "simply too vague and indefinite to create an enforceable contract." Id. at 2. The oral promise to provide "all documentation necessary" did "not provide any indication of the nature and extent of the parties' putative obligations" [and] "[w]hile their respective roles in the contemplated transaction are reasonably clear . . . there is no indication as to which party was responsible for identifying the necessary export documents. Nor is there any indication whether [the defendant] was supposed to act proactively or only after a request by [the plaintiff], or of the timeframe in which either party was to act." Id. That is, the agreement was "silent" on material matters as to the relative obligations of the parties. Id. at 3.

Similarly, in Armstrong, there was an alleged oral promise by the defendant to provide plaintiffs "with all of the work they could handle." Armstrong, 349 F. Supp. 2d at 78. The court found that the "alleged promise [was] too vague . . . to ascertain a reasonably certain basis for providing an appropriate remedy." Id. at 79. Specifically, there were a host of issues including the volume of work to be performed, the nature and scope of the work, the price to be paid and the duration of the contract. Id. at 79-80. Accordingly, the court held that "the alleged oral contract here is too imprecise to be enforceable as a matter of a law" and dismissed the plaintiff's claim for breach of contract. Id. at 81.

Finally, in Held v. Zamparelli, 13 Mass. App. Ct. 957 (1982), the Massachusetts Appeals Court held that the defendant's oral promise to pay the plaintiff a portion of the profits from leased

land did not amount to an enforceable contract since it was "too vague and indefinite to be enforceable" where it was "silent as to essential terms of the contract, such as, but scarcely limited to: when the plaintiff's share of the profits was to be computed and to be paid to her; the duration of the agreement under which she claims the right to a share of the profits; what was to occur if the property [that was leased] were sold; or what would be the plaintiff's responsibility should there be a claim against the owners of the property." Id. at 962.

Accordingly, as in PSMG Int'l, Inc., Armstrong and Held, the alleged promise by Karsan was too vague, particularly in the absence of agreement on material terms including but not limited to how the bonus would be determined and the duration of the alleged agreement, to constitute an enforceable contract for a bonus of $89,400 in 2008 and 2009. That Cooper received a bonus in this amount in 2007 (and Karsan's March 2008 e-mail message that he should receive a bonus in that amount then) does not dictate otherwise. Moreover, the cases upon which Cooper relies are readily distinguishable since they involved agreements that provided material terms that determined the parties' obligations. In Cataldo v. Zuckerman, 20 Mass. App. Ct. 731 (1985), the court rejected the defendant's argument that a 1971 memorandum was "too vague and preliminary in nature" to be an enforceable contract, concluding that it contained "[a]ll of the essential terms of the contract in a form sufficiently definite so that the nature and extent of the obligations of the parties can be ascertained." Id. At 853-54 (internal quotations omitted). In reaching this conclusion, the court noted in part that the parties' written agreement provided adequate guidance for the various partnership arrangements and included a precise formula for compensation to the plaintiff. Id. at 854. Similarly, in Lafayette Place Assocs. v. Boston Redevelopment Auth., 427 Mass. 509 (1998), the Supreme Judicial Court declined to declare a contract unenforceable where the parties' written

10

option contract included a specified formula and procedure to determine the future price to be paid for a parcel of land even as the contract price was still undetermined and it left open other terms such as the exact size of the parcel of land to be purchased. Id. at 825-26. The agreement as to material terms reached in these cases stands in stark contrast to the alleged agreement reached here by Kenexa and Cooper.

> B. **Even Assuming *Arguendo* that the Parties Had an Enforceable Contract, Kenexa Did Not Breach that Contract**

Even if the Court assumes that the parties had an enforceable contract (which it finds they did not), Kenexa did not breach that contract by giving Cooper bonuses in amounts less than $89,400 in 2008 and 2009. As Cooper has acknowledged, the determination of his bonus was in the discretion of Kenexa, depending on several factors, namely the company's performance and his performance in the given year. Even shortly after his conversation with Karsan in 2006, Cooper noted that the discussion concerned his "bonus potential" and that the tradeoff he had made in going to work for Kenexa was in "opting to drop [his] base [salary] and take more risk" for a potentially larger bonus. SOF, ¶ 11; Cooper Dep. at 44-46; Kerman Decl. Exh. C. He also understood that the company's performance would have an impact on his annual bonus, SOF, ¶ 12; Pl. Resp. to SOF, ¶ 12; Cooper Dep. at 34-35, 49, 50-51, 92-93 as would his annual performance. SOF, ¶ 15.

The landscape upon which Kenexa, in its discretion, awarded Cooper a bonus of $89,400 in 2007 was very different from the landscape in the two subsequent years. The company's overall performance suffered in 2008 and continued to suffer in 2009. Moreover, in 2008, Cooper failed to achieve several of his performance goals and by 2009 was at odds with his supervisor over a variety of professional matters. Even accepting that the terms of Cooper's alleged agreement with Karsan were not too vague to be enforceable as a contract for a $89,400 bonus in 2008 and 2009,

11

the most that can be said on the otherwise undisputed record of material fact was that it amounted to an agreement for a bonus potential of $89,400 for each of those years. That is, even in that scenario, Kenexa retained the discretion to determine the amount of Cooper's bonus based on the company's performance and his performance and its bonus awards to him of $14,000 in 2008 and $5000 in 2009 did not constitute a breach of contract. See Artuso v. Vertex Pharm., Inc., 637 F.3d 1, 6-7 (1st Cir. 2011) (affirming dismissal of a breach of contract claim where a departing employee did not receive a bonus since the parties' agreement did not guarantee a bonus and all bonuses were made at the discretion of the defendant).

Cooper's reliance on the lack of quarterly reviews (or "check ins") that he received during the course of his employment with Kenexa does not aid his argument that the company breached the alleged agreement for a $89,400 bonus in 2008 and 2009. Kenexa had a policy and practice of conducting quarterly performance reviews, at least as reflected in its 2009 Employee Handbook. Pl. Resp. to SOF, ¶ 38; Cooper Aff. at ¶10[4] and Exhs. B and C; Kerman Supp. Decl. Exh. A; Def. Reply at 9 n. 6. Cooper claims that he received no such evaluations in 2007, only one in 2008 and none in 2009. Pl. Resp. to SOF, ¶¶ 40, 45-46, 50. Whether he received such evaluations, however, is not material to the breach of contract claim before the Court. It is undisputed that the subject of these quarterly "check-ins" was not discussed in his November 2006 conversation with Karsan nor

---

[4]Kenexa has moved to strike portions of Cooper's Affidavit on the grounds that those portions contain inadmissible statements that fail to satisfy Fed. R. Civ. P. 56(c)(4) because they are not based upon personal knowledge, contain improper opinions or conclusions and/or are based upon inadmissible speculation. D. 30. Since the Court finds that most of the assertions in the Cooper Affidavit that Kenexa moves to strike–namely Paragraphs 15, 16, 18, 19, 20, 21 of the Cooper Affidavit–are not material and the remainder–namely Paragraphs 23 and 24–are speculative and conclusory, the Court need not address the former and has addressed the latter in this Memorandum. Accordingly, the Court DENIES the motion to strike as moot.

in any of the subsequent e-mail communications on this topic. That is, there is nothing in the undisputed record that ties any obligation of Kenexa's to conduct these quarterly reviews[5] to the determination of Cooper's bonus. Even as the parties agree that Cooper's performance was a factor in Kenexa's determination of his bonus, there is nothing in this record to suggest that even if there was an enforceable contract, that it was tied to this specific measure of performance.

Moreover, Cooper has not shown that he was harmed by failing to receive such quarterly evaluations. Cooper argues that if he had received quarterly feedback, he could have used this information to improve his performance and, presumably, earn a higher bonus. Pl. Resp. To SOF ¶ 54; Cooper Aff. ¶ 23. Although it may have been better management practice to have quarterly "check-ins," it is mere speculation for Cooper to suggest that if he had this feedback, his performance would have improved and his bonuses in 2008 and 2009 would have been greater. In fact, the record suggests otherwise: in one of the years in which he had no reviews, 2007, he received his full bonus of $89,400. Moreover, Cooper's suggestion that his performance in 2007 "was not without flaws," Pl. Resp. To SOF, ¶ 40, is not inconsistent with Kenexa awarding him in a higher bonus that year, when the company was in better financial condition than it was in the two later years.

Accordingly, the Court concludes that there is no genuine dispute of material fact and Kenexa is entitled to judgment as a matter of law on Cooper's claim for breach of contract.

---

[5]Although the Kenexa's 2009 Employee Handbook addresses these quarterly feedback sessions, the handbook contains a disclaimer that none of its provisions "guarantee any fixed terms and conditions of . . . employment" and that the policies and practices contained therein may be changed at any time. Kerman Suppl. Decl. Exh. A; Def. Reply at 9.

## VI. Conclusion

For the foregoing reasons, Kenexa's motion for summary judgment is GRANTED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge